**PEOPLE OF THE VIRGIN ISLANDS, Plaintiff**
**v.**
**SHAQUAN PRENTICE, Defendant**
**PEOPLE OF THE VIRGIN ISLANDS, Plaintiff**
**v.**
**SHAQUIELLE CORREA, Defendant**

Case Nos. SX-14-CR-274, SX-14-CR-275

Superior Court of the Virgin Islands

Division of St. Croix

February 23, 2016

81

83

84

85

ROYETTE RUSSELL, ESQ., Virgin Islands Department of Justice, Christiansted, St. Croix, USVI, *Attorney for the People of the V.I.*

NESHA CHRISTIAN-HENDRICKSON, ESQ., Office of the Territorial Public Defender, Kingshill, St. Croix, USVI, *Attorney for Defendant Shaquan Prentice.*

CHARLES E. LOCKWOOD, ESQ., Nichols, Newman, Grey, & Lockwood, P.C., Christiansted, St. Croix, USVI, *Attorney for Defendant Shaquielle Correa.*

MOLLOY, *Judge*

## MEMORANDUM OPINION

(February 23, 2016)

**THIS MATTER** comes before the Court on a Motion to Suppress Evidence filed by Defendant Shaquan Prentice on December 23, 2014. On May 28, 2015 and June 1, 2015, the Court held a suppression hearing. Assistant Attorney General Royette Russell appeared for the People of the Virgin Islands ("the People"). Public Defender Nesha Christian-Hendrickson appeared for Defendant Shaquan Prentice ("Prentice"). Attorney Charles Lockwood appeared for Defendant Shaquielle Correa

("Correa"). At the suppression hearing, Correa orally moved to join Prentice's Motion to Suppress.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This matter arises out of an incident that is alleged to have occurred on or about August 1, 2014, from which Defendants are charged with the following offenses: (1) Unauthorized Possession of a Firearm in violation of 14 V.I.C. § 2253(a); (2) Possession of Ammunition in violation of 14 V.I.C. § 2256(a); (3) Failure to Report Firearms Obtained Outside or Brought Into the Virgin Islands in violation of 23 V.I.C. § 470(a); (4) Importation of Firearm without a License in violation of 14 V.I.C. § 467(a); (5) Possession of a Firearm with Altered or Obliterated Identifying Marks in violation of 23 V.I.C. § 481(b); and (6) Possession of a Controlled Substance with Intent to Distribute in violation of 19 V.I.C. § 604(a)(1). Additionally, Prentice is individually charged with Simple Possession of a Controlled Substance in violation of 19 V.I.C. § 607(a).

According to the testimony at the suppression hearing, at approximately midnight, Officer Kai Joseph ("Officer Joseph") received a call from an acquaintance describing a suspicious white vehicle driving back and forth in front of, or "casing," an area in the Estate Williams Delight Housing Community. Officer Joseph transmitted the information to Police Officer Gregory Bennerson ("Officer Bennerson"), who drove to the area and shortly thereafter observed a white vehicle with the license plate number matching that described by 911 dispatch parked at Plot 204 in William's Delight. The vehicle drove away from Plot 204, and Officer Bennerson followed it. Officer Bennerson testified that, upon observing that the vehicle had heavily tinted side windows, he activated his lights and siren. The vehicle came to a stop near Plot 213 in Williams Delight, and Officer Bennerson directed, over his PA system, that the driver step out of the vehicle and produce his driver's license and vehicle documents. However, over the course of approximately twenty-two (22) seconds, the driver, later identified as Prentice, opened his door, looked back at Officer Bennerson, shut the door, and drove away. Officer Bennerson again activated his lights and siren, continued to follow the vehicle, and he testified that he observed that Prentice made a left hand turn down a side street, for which he failed to signal. Officer Bennerson followed the vehicle until it came to a stop.

Officer Bennerson testified that he observed that the driver and passenger were both reaching towards the backseat and rummaging around, so, concerned for his safety and that of his backup officers (who arrived in a separate vehicle), Officer Wyrzykowski and Officer Guzman, Officer Bennerson exited his vehicle and commanded the Defendants to exit their vehicle. The officers had their weapons drawn downwards at a 45-degree angle for the duration of the interaction with the Defendants. Officer Bennerson ordered the Defendants to put their hands on the roof of the car, and they complied. Citing officer safety concerns, the officers performed a "pat down" of the Defendants' outer clothing for weapons. In patting down Prentice, Officer Wyrzykowski felt hard objects in Prentice's pockets, and he removed them. Upon inspection, they turned out to be two vials of marijuana, a cell phone, and a glasses case full of marijuana.

Once the pat-down was completed, the officers and the Defendants moved to the rear of the car, and the Defendants followed Officer Bennerson's instructions to place their hands on the vehicle. Officer Bennerson testified that he observed the Defendants' demeanor to be very nervous, and that this, combined with the other circumstances, caused him to believe that "something was up." He asked Prentice if he could search the vehicle. Officer Bennerson and Officer Wyrzykowski both testified that Prentice remained silent, initially. He asked again, and Prentice responded: "Yeah." Officer Bennerson then asked Prentice for his license, registration, and proof of insurance. Prentice indicated that he did not have his driver's license on his person and that the vehicle was a rental. Officer Wyrzykowski then proceeded to search the vehicle, beginning with the front of the car. He retrieved a brown paper bag on the floor of the driver's side of the vehicle, and inside it, found a green, leafy substance that later tested positive as marijuana. Officer Wyrzykowski testified that he then opened the left rear door of the vehicle, and he observed what he recognized to be about ¼ inch of a gun's muzzle sticking out from under a towel and a trash bag on the back seat of the car. He then yelled out, "Gun, gun!" Defendants were then placed into handcuffs, read their *Miranda* rights by Officer Bennerson, and transported to the Wilbur H. Francis Police Station. There, a police detective confirmed that neither individual had a license to carry or possess a firearm.

Detective Robert Kressley, the forensics officer with the Virgin Islands Police Department who processed the scene in this matter, testified at the

88

suppression hearing that the items that he collected included a quantity of green leafy substance which tested positive for the presence of tetrahydrocannabinol, a CN Romania semi-automatic rifle with an obliterated serial number, and two 30-round magazines of ammunition (one internal, one external).

On December 23, 2014, Prentice filed his Motion to Suppress Evidence. Therein, he alleges that the stop, search, and subsequent seizure of his person were unlawful, and accordingly, the physical evidence and statements collected as a result of the stop, search, and seizure should be suppressed. Def.'s Mot. to Suppress, at 2-8.

## II. LEGAL STANDARD

█ The Fourth Amendment of the United States Constitution protects against unreasonable searches and seizures. U.S. CONST. amend. IV. To protect these rights, the Supreme Court has held that evidence obtained through unreasonable searches and seizures is excluded from use in criminal prosecutions. *Mapp v. Ohio*, 367 U.S. 643, 654-57, 81 S. Ct. 1684, 6 L. Ed. 2d 1081, 86 Ohio Law Abs. 513 (1961). Reasonableness is an objective inquiry measured by examining the totality of the circumstances surrounding the search or seizure and the nature of the search or seizure itself. *United States v. Montoya de Hernandez*, 473 U.S. 531, 537, 105 S. Ct. 3304, 87 L. Ed. 2d 381 (1985); *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S. Ct. 417, 136 L. Ed. 2d 347 (1996). As a general rule, warrantless searches and seizures are presumptively unreasonable. *Horton v. California*, 496 U.S. 128, 133, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (1990). However, where the government's interest in effectuating a search or a seizure without a warrant outweighs the individual's privacy interest, courts have found limited exceptions to the warrant requirement. *Id.*; *see also Montoya de Hernandez*, 473 U.S. at 537-41.

█ Ordinarily, the burden of proof is on the defendant who seeks to suppress evidence. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995). That burden, however, shifts to the government to show that the search or seizure was reasonable once the defendant has established a basis for his motion, i.e. the search or seizure was conducted without a warrant. *Id.* It is undisputed that the police officers conducted a warrantless search of Prentice's vehicle, the persons of both Defendants, and conducted a warrantless seizure of Defendants. Accordingly, the

People bear the burden of proof to demonstrate that the actions of the police officers were reasonable under the Fourth Amendment.

## III. DISCUSSION

Prentice contends that the officers' stop of his vehicle was unconstitutional because the "anonymous tip" given to the police did not have sufficient indicia of reliability to provide reasonable suspicion necessary to justify a stop of the vehicle. The People argue that the tip was not anonymous, that it provided sufficient indicia of reliability and that, examining the totality of the circumstances, the police possessed reasonable suspicion to stop the vehicle. Prentice contends that the first stop of his vehicle constituted a Fourth Amendment event because he did not feel free to leave. The People argue that the first stop did not constitute a Fourth Amendment event because he did not submit to the authority of the police until the second stop. Prentice further argues that the warrantless search of the vehicle, and subsequent seizure of his person, was unreasonable and that he did not give valid consent for the police to search his vehicle. The People argue that the search occurred permissibly and incident to the *Terry* stop.

### A. Officer Bennerson Had Reasonable Suspicion to Stop the Vehicle.

Prentice contends that the police stopped him without a particularized basis for believing that he was engaging in criminal activity. Prentice maintains that the initial traffic stop was not supported by probable cause or reasonable suspicion because he was not engaged in any criminal activity at the time of the stop. The People argue that the police officer had reasonable suspicion sufficient to legitimately stop Prentice based on the car description given in the 911 call, which matched the color and license plate number of the car, the traffic violations committed by Prentice, and Prentice's "evasive" conduct in speeding off. The People must demonstrate that the investigative stop was permissible under one of the exceptions to the warrant requirement.

One exception to the warrant requirement is an investigatory stop conducted in accordance with *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968). Under *Terry*, law enforcement officers may conduct an investigatory stop when justified by a reasonable suspicion that an individual is engaged in criminal activity. *Terry*, 392 U.S. at 21, 28-31. Reasonable suspicion exists when there are "specific and articulable

facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Id.* at 21. An "officer . . . must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.' " *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989) (quoting *Terry*, 392 U.S. at 27). The Supreme Court of the United States cautions that the concept of reasonable suspicion is not "readily, or even usefully, reduced to a neat set of legal rules." *Sokolow*, 490 U.S. at 7. Consequently, "[c]alculating whether an officer has reasonable suspicion to warrant a stop and search is often an imprecise judgment." *Robertson*, 305 F.3d at 168. Accordingly, "[c]ourts give considerable deference to police officer's determinations of reasonable suspicion . . ." *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006). Thus, "[i]n determining whether there was a basis for reasonable suspicion, a court must consider the totality of the circumstances, in light of the officer's experience." *United States v. Givan*, 320 F.3d 452, 458 (3d Cir. 2003). Reasonable suspicion may be the result of several factors, including specialized knowledge and investigative inferences, personal observation of suspicious behavior, and information received from reliable sources. *Blyden v. People*, 53 V.I. 637, 649 (2010) (citing *United States v. Nelson*, 284 F.3d 472, 478 (3d Cir. 2002)). Evidence obtained as a result of a "*Terry* stop" that does not meet this exception must be suppressed as "fruit of the poisonous tree." *United States v. Brown*, 448 F.3d 239, 244 (3d Cir. 2006) (citing *Wong Sun v. United States*, 371 U.S. 471, 487-88, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963)).

## 1. No Fourth Amendment Event Occurred when Prentice First Stopped his Vehicle, Looked Back, and Continued Driving.

As a threshold matter, the Court must determine when, precisely, a Fourth Amendment event actually occurred. Prentice argues that he was "seized" under the Fourth Amendment when he paused his vehicle, looked back, and drove away, in response to Officer Bennerson's lights, siren, and amplified request that he produce his license and registration. "A seizure occurs when a reasonable person (1) would not feel 'free to leave' or (2) would not feel 'free to decline the officers' requests or otherwise terminate the encounter.' " *Brendlin v. Cal*, 551 U.S. 249, 250, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007). In *California v. Hodari D.*, 499 U.S. 621, 111 S. Ct. 1547, 113 L. Ed. 2d 690 (1991), the Supreme Court of the United States held that, for a Fourth Amendment seizure to

occur, there must be a show of authority by police, as well as a *submission to that authority* by the seized — the subject of the seizure must "yield" to the authority of the police. *Id.* at 626. "Whether conduct constitutes submission to police authority will depend, as does much of the Fourth Amendment analysis, on 'the totality of the circumstances — the whole picture.' " *United States v. Baldwin*, 496 F.3d 215, 219 (2d Cir. 2007), *quoting United States v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981).

██ ██ The Court finds that there was no seizure under the Fourth Amendment when Prentice paused, looked back, and drove away because he did not submit to the authority of the police, as is required for a Fourth Amendment seizure to occur. The Supreme Court of the United States has held that: "A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned." *Brendlin*, 551 U.S. at 254. In *United States v. Baldwin*, a case with facts very similar to those underlying this matter, the Second Circuit Court of Appeals held that no Fourth Amendment seizure occurred when a car paused in response to a police car putting on its siren and pursuing it; and the driver of the car leaned out the window, peered back, and then sped off. *Baldwin*, 496 F.3d at 216-17. The *Baldwin* court held that: "[T]o comply with an order to stop — and thus to become seized — a suspect must do more than halt temporarily; he must submit to police authority, for there is no seizure without actual submission." *Id.* at 218 (internal citation omitted). The *Baldwin* defendant argued, as does Prentice, that he was seized at the moment he pulled over because "a reasonable person would have believed that he was not free to leave." *Id.* at 219, *quoting United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980). However, this requirement "states a necessary, but not a sufficient, condition for seizure," *Hodari D.*, 499 U.S. at 628. Additionally, the key factor is not the brevity of the stop, but whether the stop constituted actual submission to authority; "it is the nature of the interaction, and not its length, that matters." *Baldwin*, 496 F.3d at 219; *see also Delaware v. Prouse*, 440 U.S. 648, 655, 99 S. Ct. 1391, 59 L. Ed. 2d 660 (1979). Examining the totality of the circumstances surrounding the incident, the Court does not find that Prentice submitted to police authority when he paused his car, looked back at the police, and then drove off, within a period of approximately

twenty-two seconds. Accordingly, Prentice was not "seized" within the meaning of the Fourth Amendment when he first "stopped" his vehicle.

## 2. A Fourth Amendment Event Occurred When Prentice Stopped his Vehicle the Second Time and Submitted to Police Authority.

The Court finds that a Fourth Amendment seizure occurred when Prentice stopped his vehicle a second time, and he and Correa exited the vehicle. After the initial stop of his vehicle, Prentice drove off, Officer Bennerson again activated his siren and lights, and he followed the vehicle until it came to a stop. After stopping the vehicle, Prentice and Correa followed police instructions to exit the vehicle. The Court finds that the officer's use of his lights and siren, in conjunction with the pursuit of Prentice's vehicle and instructions to exit the vehicle, constitute a show of authority sufficient to effect a Fourth Amendment seizure because a reasonable person would not believe that he would be free to leave. *See United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L. Ed. 2d 497 (1980) ("Examples of circumstances that might indicate a seizure . . . would be the threatening presence of several officers, the display of a weapon by an officer . . . or the use of language or tone of voice indicating that compliance with the officer's request might be compelled."). And, the Court finds that Prentice and Correa's actions in stopping the vehicle and exiting at the officer's command constitute submission to this authority necessary to effect a Fourth Amendment seizure, as they yielded to the officer's authority by following his orders. Indeed, Officer Bennerson's testimony at the suppression hearing explicitly indicated that the Defendants were "not free to leave" after they exited their car, Accordingly, the Court finds that Prentice and Correa were "seized," within the meaning of the Fourth Amendment, when they stopped the vehicle a second time and exited.

## 3. The Officers had Reasonable Suspicion to Conduct an Investigatory Stop.

Having determined that the investigatory "stop" occurred when Prentice stopped the vehicle a second time, the Court must determine whether the People have established that the stop was supported by reasonable suspicion that Prentice and Correa were engaged in criminal activity. The People argue that the police officers had reasonable

suspicion sufficient to effectuate the stop based on the car description given in the 911 call, which matched the color and license plate number of the car, their impression of Williams Delight as a "high-crime" neighborhood, the traffic violations committed by Prentice, and his "evasive" action in driving away from the police. Considering the totality of the circumstances surrounding the stop, the Court agrees with the People that the police had a "particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273, 122 S.Ct. 744, 750, 151 L. Ed. 2d 740 (2002).

 Generally, law enforcement officers are afforded considerable deference to their conclusions and observations, due to their specialized experience. *Id.* Firstly, while "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity inasmuch as ordinary citizens generally do not provide extensive recitations of the basis of their everyday observations," *Alabama v. White*, 496 U.S. 325, 329, 110 S.Ct. 2412, 2415, 110 L. Ed. 2d 301 (1990), the Court finds, based on the record of the suppression hearing, that the caller was not anonymous, as Officer Joseph, the 911 operator testified that the caller was "a friend" and that he was "familiar" with her. Additionally, the 911 caller successfully identified the location, color, and the precise license plate number of Prentice's vehicle.[1] Secondly, before effectuating the stop, Officer Bennerson personally observed traffic violations, including Prentice turning left without signaling[2] and maintaining a window tint that the officers, based on their professional experience, believed to be illegally tinted.[3] The United States Supreme Court has noted that "the

---

[1] At the suppression hearing, the parties spent a significant amount of time disputing whether the make of Prentice's car, a Toyota Corolla, matched the make referenced by the 911 caller, a Chevy Cavalier. The Court does not find this discrepancy to be significant in light of the totality of the circumstances surrounding the stop, particularly the other, more important, accurate details about the vehicle referenced by the 911 caller. *See White*, 496 U.S. at 331 ("[B]ecause an informant is shown to be right about some things, he is probably right about other facts that he has alleged, including the claim that the object of the tip is engaged in criminal activity.")

[2] 20 V.I.C. § 495(d) provides that "[e]very driver of a motor vehicle shall indicate his intention of starting, stopping, turning, or backing by signals prescribed by the Police Commissioner."

[3] Title 20 V.I.C. § 800 provides that "[i]t is unlawful for any person to operate or park a motor vehicle on any public road or highway of the Virgin Islands while the motor vehicle has windows that are tinted with glazed material to the extent that visible light transmittance is

foremost method of enforcing traffic and vehicle safety regulations . . . is acting upon observed violations." *Whren v. United States,* 517 U.S. 806, 817, 116 S.Ct. 1769, 1776, 135 L. Ed. 2d 89 (1996) (holding that a *Terry* stop was reasonable under the Fourth Amendment when police officers stopped a vehicle due to their personal observations of traffic violations committed) (internal citations omitted). Thirdly, regarding the police officers' testimony regarding their impressions of Williams Delight as a "high crime area," due to their professional experiences responding to often-violent crimes there, the United States Supreme Court has stated that, while:

> An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime . . . officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation . . . the fact that the stop occurred in a "high crime area" [is] among the relevant contextual considerations in a *Terry* analysis.

*Illinois v. Wardlow,* 528 U.S. 119, 124, 120 S. Ct. 673, 676, 145 L. Ed. 2d 570 (2000). Finally, the People characterize the Defendants' conduct in driving away from the police as "evasive" and thus an additional factor bolstering the reasonableness of their suspicion that criminal activity was afoot. Courts have long recognized that "evasive behavior is a pertinent factor in determining reasonable suspicion." *Id.* ("Headlong flight — wherever it occurs — is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."). The Court in *Wardlow* recognized that individuals are certainly within their rights to ignore police officers and go about their business when they attempt to approach absent reasonable suspicion; however, examining the Defendants' actions in driving away from the police after they had previously been ordered to exit the

---

reduced to less than 35%." The Superior Court of the Virgin Islands, consistent with precedent from the Third Circuit Court of Appeals, has held that a police officer does not have to know for a certainty that windows are tinted illegally before executing an investigatory stop, but only has to have reasonable suspicion of such. *See People of the V.I. v. Smith,* 2015 V.I. LEXIS 121 (V.I. Super. Ct. Sept. 29, 2015); *United States v. Gooch,* 915 F. Supp. 2d 690 (3d Cir. 2012); *United States v. Hall,* 270 Fed. Appx. 123, 126 (3d Cir. 2008).

vehicle, and, failing to signal as they did so, the Court finds that their evasive action contributed reasonably to the police's suspicion that criminal activity was afoot. Accordingly, based on the information provided from the 911 call, the illegal left turn, the suspicion of illegal tint on the vehicle's window, the high-crime nature of the area, and the Defendants' evasive behavior, the Court finds that the totality of the circumstances support a finding that the investigatory stop was permissible under the Fourth Amendment.

## B. *Evidence Seized as a Result of the Pat-Down.*

▬ Having determined that the investigatory stop was permissible, the Court must now determine whether the evidence seized as a result of the officer's "pat down" of Prentice must be suppressed under the Fourth Amendment. The United States Supreme Court allows for a narrow class of physical searches, or "frisks," during a *Terry* stop; "there must be a narrowly drawn authority to permit a reasonable search for weapons for the protection of the police officer, where he has reason to believe that he is dealing with an armed and dangerous individual, regardless of whether he has probable cause to arrest the individual for a crime." *Terry v. Ohio*, 392 U.S. 1, 27, 88 S. Ct. 1868, 1883, 20 L. Ed. 2d 889 (1968). In *Terry*, the Supreme Court stated that in order to determine the reasonableness of the search: "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Id.* Pursuant to this reasonable belief of danger, *Terry* allows for a pat down of a suspect's outer clothing to search for a weapon. *Id.*

▬ In this matter, the People cite to the high-crime nature of the neighborhood, bolstered by the police officers' firsthand professional experiences, the Defendants' evasive action in pausing and speeding off, initially refusing to heed the authority of the police, and to the police officers' observations that, upon stopping the vehicle, Prentice and Correa reached back and "fumbled with something in the backseat" as the basis for their safety concern. "Giving due weight to the experience of the officer," *United States v. Rickus*, 737 F.2d 360, 365 (3d Cir. 1984), particularly as to the high-crime nature of neighborhood, and acknowledging case law that grants deference to officers' observing "quick, furtive movements" as contributing to reasonable belief that a suspect may be armed, *see United States v. Yamba*, 506 F.3d 251, 255 (3d

Cir. 2007), the Court finds that the police were justified in their belief that the Defendants could be armed, and accordingly, the frisk of the Defendants was permissible.

 While the police were justified in conducting a pat-down of the Defendants for weapons, the Court must now examine the admissibility of the marijuana obtained as a result of the pat-down. "The proper scope of a search becomes critical when police discover something suspicious they were not expecting or intending to find." *Id.* at 256. While, police may, "under certain circumstances . . . seize contraband detected during the lawful execution of a *Terry* search," *Minnesota v. Dickerson*, 508 U.S. 366, 374, 113 S. Ct. 2130, 2136, 124 L. Ed. 2d 334 (1993), during a *Terry* frisk, this contraband must either reasonably appear to be a weapon, as is the very purpose of a *Terry* frisk, or, at the time of the pat-down, its "plain feel" must immediately reveal it to be contraband, or, in other words, its "contour or mass [must] make its identity immediately apparent[.]" *Id.* at 375.

 In this matter, the People justify the police officers' retrieval of vials of marijuana and a glasses case full of marijuana on the grounds that all of these items were "hard objects," and thus could reasonably be suspected to be weapons. However, while case law permits the seizure of some small objects, such as a wallet, when characterized by the police officer in a manner such as a "four-inch long and three-inch wide object . . . that . . . felt like an object that could conceal a weapon," *United States v. Muhammad*, 604 F.3d 1022, 1026 (8th Cir. 2010), this was not the case here. During questioning about the seizure of the vials during the suppression hearing, Officer Wyrzykowski specifically responded to an inquiry as to whether vials feel like weapons by stating, "Not the two I felt in [Prentice's] left pocket." As the People provided no further testimony to indicate that Officer Wyrzykowski had reason to believe that the vials were contraband, based on their "plain feel," the Court thus finds that the vials were seized in violation of the Fourth Amendment of the United States Constitution. Accordingly, the vials of marijuana will be suppressed.

 As for the glasses case, revealed upon inspection to be full of marijuana, a similar turn of events transpired in *United States v. Brakeman*, 475 F.3d 1206 (10th Cir. 2007). In *Brakeman*, the Defendant challenged the police officer's action in opening a sunglasses case taken off of the Defendant's person during a *Terry* frisk on the grounds that an officer's pat-down impermissibly extended to the contents of the glasses

case. The Court held that the officer's actions were permissible on the grounds that, "[t]he glasses case could have contained a weapon . . . Consequently, [the officer's] search could extend to its contents to ensure that nothing dangerous was inside." *Id.* at 1213. Likewise, we find that the marijuana in Prentice's sunglasses case was lawfully seized because Officer Wyrzykowski's action in opening the sunglasses case was reasonably taken to ensure officer safety. Accordingly, the Court will not suppress the marijuana retrieved from the glasses case.

## C. *Search of the Vehicle.*

▉ The Defendants argue that the evidence obtained as a result of the officers' search of the vehicle — a paper bag full of marijuana, a firearm with an obliterated serial number, and ammunition — must be suppressed because the warrantless search of the vehicle was constitutionally impermissible and Prentice did not consent for the vehicle to be searched.[4] The People argue that the search was conducted permissibly and incident to a valid *Terry* stop, and that regardless, Prentice consented to the search of the vehicle.

### 1. *Prentice Did Not Consent to the Search of the Vehicle.*

▉ The People contend that Prentice consented to the search of the vehicle. Prentice counters that, as a scared 19-year-old,[5] outnumbered by policemen holding guns and accompanied by a K-9 "officer," having never been informed by police that he could refuse the search, and having been presented the request to search in the form of a demand, he did not voluntarily consent to the search of the vehicle. The Fourth and Fourteenth Amendments to the United States Constitution require that a

---

[4] It should be noted that Correa, the passenger, does not have standing to object to the search of the vehicle, as a passenger to a vehicle does not possess a legitimate expectation of privacy in the vehicle of another subject to protection by the Fourth Amendment. *See generally Rakas v. Illinois,* 439 U.S. 128, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978).

[5] No testimony was offered at the suppression hearing to evince the Defendants' ages, although Prentice argued both in his motion to suppress and at the suppression hearing that he was 19 years old at the time of the incident. However, because the People did not dispute Prentice's age as argued by the defense and the Virgin Islands Police Department Arrest log indicates that his date of birth is November 24, 1994, the Court will consider the fact that Prentice was 19 years old at the time of the incident in its analysis as to whether Prentice's constitutional rights were violated.

defendant's consent to have his vehicle search be "voluntary." *See Schneckloth v. Bustamonte*, 412 U.S. 218, 228, 93 S. Ct. 2041, 2048, 36 L. Ed. 2d 854 (1973) ("the Fourth and Fourteenth Amendments require that a consent not be coerced, by explicit or implicit means, by implied threat or covert force . . ."). To justify a search based on consent, the Government "has the burden of proving that the consent was, in fact, freely and voluntarily given." *Thomas v. People of the V.I.*, 63 V.I. 595, 607 (V.I. 2015), *quoting Bumper v. North Carolina*, 391 U.S. 543, 548, 88 S. Ct. 1788, 20 L. Ed. 2d 797 (1968). This burden is not satisfied by a mere showing of submission to lawful authority. *Id.* "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Id.* at 227. Factors that a Court may consider in determining whether consent was voluntary include, but are not limited to: (1) the Defendant's knowledge of the constitutional right to refuse consent, *see id.* at 249 ("While a Defendant's right to refuse consent is a factor to be taken into account, the prosecution is not required to demonstrate such knowledge as a prerequisite to establishing a voluntary consent."); (2) the defendant's age, intelligence, education, familiarity with law enforcement, and language ability, *see United States v. Price*, 558 F.3d 270, 279 (3d Cir. 2009), *United States v. Ngai Man Lee*, 317 F.3d 26, 33 (1st Cir. 2003); (3) the degree to which the defendant cooperates with the police, *see U.S. v. Weidul*, 325 F.3d 50, 54 (1st Cir. 2003); and (4) the nature of the interaction, including police threat of physical punishment or other coercive behavior, express or implied, *see U.S. v. Morales*, 171 F.3d 978, 983 (5th Cir. 1999).

 ██ Examining the totality of the circumstances in this matter, the Court finds that the government has not met its burden to demonstrate that Prentice's consent was voluntary. Prentice, aged nineteen, was confronted and outnumbered by three police officers with their weapons drawn and loaded, with a K-9 officer at the ready, in the middle of the night, having just been searched; all of these factors, particularly the officers' brandishing of their weapons, weigh against a finding of voluntary consent. *See United States v. Washington*, 490 F.3d 765, 775-76 (9th Cir. 2007) ("We . . . find significant the context in which [the defendant] made his decision whether to consent to the search of his car: at night, outnumbered two-to-one . . . after complying with [the officer's] detailed instructions, and being searched under [the officer's] direction . . . The

factor [as to whether the officers had their guns drawn] weighs in favor of the government, because the district court found that [the officer] did not have his gun drawn.") (internal numeration omitted); *Morales*, 171 F.3d at 983 ("[T]he officers' actions — rushing into the warehouse with their guns drawn and ordering the suspects to the floor — do not reflect a situation where suspects have provided their consent to a warrantless search.") Officer Bennerson testified that Prentice was "nervous," and both Officer Bennerson and Officer Wyrzykowski testified that Prentice was not informed that he had the right to refuse consent to the search of the vehicle. Additionally, Prentice's initial silence, followed by the terse response of "yeah" upon a second request to search the vehicle, weighs against a finding of voluntary consent; rather, the situation likens itself to the situation in *Weidul*, where the defendant responded to the police officer's statement of "I'm going to look in here" with a terse "okay," because the repetition of the search request conveyed more of a demand than a legitimate request, and Prentice's response comprised a likewise "simple acquiescence to what any reasonable person would have perceived, under the circumstances, as police conduct tantamount to a claim of lawful authority." 325 F.3d at 54. While no testimony was given to indicate that the police actually threatened Prentice with physical harm, the Court finds nonetheless that the number of officers, with their weapons drawn, and the time of night created a situation by which Prentice likely would have felt coerced to consent to the search of his vehicle. Accordingly, having examined the totality of the circumstances, the Court finds that the People have not met their burden of establishing that the consent that Prentice gave to search the vehicle was voluntary.

### 2. *Officer Wyrzykowski Lawfully Searched the Vehicle Pursuant to Terry.*

██ ██ Notwithstanding the Court's decision that Prentice did not voluntarily consent to the search of the vehicle, the Court holds that the officers conducted a lawful search of the vehicle under *Terry*. In *Michigan v. Long*, the United States Supreme Court extended the *Terry* doctrine to allow law enforcement to search "the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, . . . if the police officer possesses a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officer in believing

that the suspect is dangerous and the suspect may gain immediate control of weapons." 463 U.S. 1032, 1049, 103 S. Ct. 3469, 3481, 77 L. Ed. 2d 1201 (1983) (internal citation omitted). The *Long* court emphasized that:

> When the officer has a reasonable belief that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon to neutralize the threat of physical harm.

*Id.* at 3479 (internal citation omitted). The *Long* Court clarified that: "The sole justification of the [*Terry*] search is the protection of the police officer and others nearby," and that the holding only endeavored to recognize, "that part of the reason to allow area searches incident to an arrest is that the arrestee, who may not himself be armed, may be able to gain access to weapons to injure officers or others nearby, or otherwise to hinder legitimate police activity." *Id.* at 3481, n.14. The Court further noted that the search in question was "restricted to those areas to which [the Defendant] would generally have immediate control, and that could contain a weapon," because: "Just as a *Terry* suspect on the street may, despite being under the brief control of a police officer, reach into his clothing and retrieve a weapon, so might a *Terry* suspect in [Defendant's] position break away from police control and retrieve a weapon from his automobile." *Id.* at 3481-82.

The People have already established that the police officers possessed the requisite reasonable suspicion to believe that the Defendants may have been in possession of weapons, and therefore, had the right to conduct the *Terry* frisk and search for officer safety. *See supra* Part III.B. The officers' search of the vehicle was justified, in particular, by Officer Bennerson's observation of the Defendants reaching back from the front seat and fumbling with something in the back seat, which raised his concerns for officer safety; he testified that the Defendants' movements were very suspicious, and led him to suspect that they were trying to conceal or hide something. *See United States v. Carthorn*, No. 93-6593, 1994 U.S. App. LEXIS 24582, at *15 (6th Cir. Sep. 8, 1994) (holding that a police officer was justified in executing a vehicle search when his "reasonable suspicions, as well as the need for further investigation, were heightened by defendant's noticeable and furtive

activity; namely, defendant's attempt to conceal something from [the officer] by stuffing it into the back seat.")

The Court finds that the scope of Officer Wyrzykowski's search permissibly reached to the "passengers' compartment of the vehicle," which reasonably encompasses the back seat of the car, especially as this was the area that the non-handcuffed Defendants would have been able to easily access from the rear of the vehicle, where they stood, and also, as the Corolla was a small car, an area where they could have stashed a weapon while they were in the front seat. Just as the police officer in *Long* lawfully searched for weapons in the front seat of the car, Officer Wyrzykowski lawfully searched for weapons in the back seat, as a weapon in the back seat of a vehicle is no less dangerous than a weapon located in the front compartment. *See United States v. Hill*, 252 Fed. Appx. 532 (4th Cir. 2007); *United States v. Dennison*, 410 F.3d 1203, 1214 (10th Cir. 2005) (upholding the denial of a motion to suppress when: "[The Officer] testified that he discovered two rifles underneath a blanket in the back seat 'within a few seconds' of starting the search of the passenger compartment . . . . Despite the officers' belief that they were conducting a search incident to Mr. Allen's arrest, Officer Wilson found these items within the parameters of a protective sweep, in 'the passenger compartment' of the truck where 'a weapon may be placed or hidden.' "); *United States v. Hill*, No. 94-41257, 1995 U.S. App. LEXIS 42514, at **10-11 (5th Cir. 1995) ("[W]hen [the police officer] visually observed the back-seat area of the vehicle's interior, he possessed a reasonable suspicion that a weapon had perhaps been stashed behind the back seat when he saw the bottom cushion of the seat, the seat cushion . . . had been pulled out about five to six inches. Having possessed this reasonable suspicion, it was reasonable for Miller to adjust the seat . . . he had reason to search anywhere such a weapon might be hidden within the passenger compartment of the vehicle, He testified that, because the car was small, the back seat area was readily accessible from the front seat."); *Carthorn*, 1994 U.S. App. LEXIS 24582, at *8 (upholding the trial court's denial of a motion to suppress when the police officer was able to articulate facts to uphold his reasonable suspicion to search the passenger compartment of a vehicle, particularly the backseat, when he observed the defendant "trying to stuff something into the backseat."); *United States v. Arnold*, 388 F.3d 237, 240-1 (7th Cir. 2004) (holding that a police officer may search a trunk through an opening accessible from the back seat of the

102

passenger compartment when it is an area "to which the suspect may have access . . . even though the weapon was technically located in the usually protected realm of the trunk. Taking into account the purpose of the officer's search, it seems likely that in no more time than it would take a motorist to retrieve a weapon from a locked glove compartment, [the defendant] could have reached the handgun. [The officer's] search of the trunk area behind the armrest did not exceed the permissible scope of a search under *Long*."); *United States v. Fell*, No. 2:01-CR-12-01, 2005 U.S. Dist. LEXIS 5891, at *6 (D. Vt. Mar. 28, 2005) ("As he looked through the Neon's windows, [the defendant] noticed the stock of a weapon sticking into the passenger compartment. The weapon protruded from the trunk into the passenger compartment over a section of the back seat that was folded down."). The Court also finds that Officer Wyrzykowski's action in opening the door of the vehicle to conduct the search was justified by his reasonable suspicion that the Defendants had a weapon in the back seat. *United States v. Hernandez*, 63 Fed. Appx. 6, 11 (2d Cir. 2003) ("[The officer's] minimally intrusive visual search of the floor of the front passenger seat through an opened car door, which he conducted to ensure that there was no weapon inside the car, was justified by his reasonable suspicion that criminal activity was afoot.") Accordingly, the Court finds that the search did not exceed its permissible scope within the vehicle under *Terry*.

### 3. *Officer Wyrzykowski's Seizure of the Marijuana was Unlawful, but the Seizure of the Firearm and Ammunition was Lawful.*

 Having determined that the police's search of the vehicle was lawful under *Terry* and *Long*, the Court must now evaluate whether the officers' seizures of the bag of marijuana, the firearm, and the ammunition were lawful. The Fourth Amendment generally prohibits warrantless seizures of property. U.S. CONST. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."). One exception to this general rule is the "plain view doctrine," which the United States Supreme Court has upheld in the context of a *Terry* stop. *See United States v. Hensley*, 469 U.S. 221, 235, 83 L. Ed. 2d 604, 105 S. Ct. 675 (1985). Under this doctrine, the

warrantless seizure of incriminating evidence is permissible when three conditions are met: (1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed; (2) the item's incriminating character must be immediately apparent; and (3) the officer must have a lawful right of access to the object itself. *Horton v. California*, 496 U.S. 128, 136-137, 110 S. Ct. 2301, 110 L. Ed. 2d 112 (U.S. 1990).

### a. *The Seizure of the Marijuana was Unlawful Because Officer Wyrzykowski Exceeded the Scope of Terry by Opening the Paper Bag.*

 ██ Regarding the paper bag in the vehicle containing vials of marijuana discovered by Officer Wyrzykowski on the floor of the driver's side of the car, the first condition of the plain view doctrine has not been met, as the vials of marijuana could not be "plainly viewed" without opening the bag. While police officers executing a *Terry* vehicle search may generally search "containers" like the center console and glove compartment, *see United States v. Holmes*, 376 F.3d 270, 280-81 (4th Cir. 2004), "searching containers is limited to those that may contain weapons or whose illegality is immediately apparent." *United States v. Pollins*, 145 F. Supp. 3d 525, 537 (D. Md. 2015), *citing Dickerson*, 508 U.S. at 374-78. An officer's decision to search a container is evaluated under an objective standard of reasonableness. *See United States v. Swann*, 149 F.3d 271, 275-77 (4th Cir. 1998).

Here, while the bag itself was in "plain view," the *contents* seized were not; rather, Officer Wyrzykowski had to open the paper bag, an action taken outside the protective search permitted by *Terry*, to reach the vials of marijuana inside. The Ninth Circuit Court of Appeals has held that law enforcement agents exceeded the scope of the protective search authorized by *Terry* when they opened a soft, vinyl briefcase when the contents therein could have been felt without opening it. *United States v. Vaughan*, 718 F.2d 332, 335 (9th Cir. 1983) ("[T]he agents could have felt the briefcase without opening it to see if any weapons were in it and . . . the opening of the case to search further was not justified. The briefcase was soft and thin. Any weapons could have been felt through the cover.") Similarly, in a case from the Maryland Court of Appeals, whereby a police officer opened a gym bag containing contraband pursuant to a *Terry*

search, the Court held that the officer exceeded the scope of *Terry* by opening the bag, a more intrusive search than the permitted "pat down" to determine whether the bag contained weapons. *McDowell v. State*, 407 Md. 327, 341, 965 A.2d 877, 885 (2009) ("When the container is subjected to a more intrusive search in lieu of a pat-down, the State can sustain its burden of proof that the search was reasonable either by having the officer explain why it was necessary to conduct that search or by demonstrating from the container itself that a pat-down would not have revealed the presence or absence of a weapon."). Here, the People have offered no testimony to explain why Officer Wyrzykowski opened the bag, rather than conducting a less intrusive outside "feel" of the bag, particularly in light of his testimony, in the context of the vials in Prentice's top pocket, that vials of marijuana do not feel like weapons. The only alternative justification for this intrusive search that the People have offered is their assertion that Prentice consented to the search of the car; however, as discussed above, his consent was not voluntary, and the search thus cannot be justified on this ground. Accordingly, the Court finds that law enforcement was outside of the scope of the Fourth Amendment when it seized the vials of marijuana in the paper bag, and accordingly, they will be suppressed.

### b. *The Seizure of the Firearm and Ammunition was Lawful under the Plain View Doctrine.*

██ ██ As for the firearm and ammunition, the first condition of the plain view doctrine is met. Because the muzzle of the gun was visible on the backseat of the car, a place that Officer Wyrzykowski could lawfully search pursuant to the *Terry* stop, he did not violate the Fourth Amendment in reaching the place from which it could be plainly viewed. As for the ammunition, once the towel was moved, exposing the firearm in its entirety, it was also plainly visible. The second condition is also met; while the testimony is not clear as to whether or not the officers knew at the time of the seizure that the Defendants did not have a license to carry a firearm or that the firearm had an obliterated serial number, *see United States v. Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000) (opining that mere possession of a firearm is not a crime in the Virgin Islands); *see also People of the Virgin Islands v. Murrell*, 56 VI 796 (V.I. 2012), the United States Supreme Court has permitted officers to seize items which are "dangerous in themselves" — including weapons — even when their

incriminating natures are not immediately apparent. *United States v. Frederick*, 152 Fed. Appx. 470, 472 (6th Cir. 2005) ("At the same time that the Court has permitted officers to seize items whose 'incriminating character' is 'immediately apparent' under the plain-view exception to the warrant requirement, it has permitted officers to seize 'objects dangerous in themselves.' " (citing *Coolidge v. New Hampshire*, 403 U.S. 443, 472, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971) (plurality))); *United States v. Bishop*, 338 F.3d 623, 626 (6th Cir. 2003) ("The Supreme Court also has indicated that the plain view exception permits the warrantless seizure of 'objects dangerous in themselves.' "). Accordingly, because the seized firearm in this case, a CN Romania semi-automatic rifle, is an object dangerous in itself, and was apparent as such by virtue of the exposed muzzle, the second condition has been met. And, as to the third condition, because Officer Wyrzykowski had lawful access to the weapon by virtue of the *Terry* stop — indeed, a search for weapons is the primary purpose of a *Terry* search — the third condition is fulfilled. Accordingly, the weapon and ammunition were lawfully seized under the "plain view" exception to the warrant requirement.

## IV. CONCLUSION

In summary, the Court finds that the People have demonstrated the existence of recognized exceptions to the warrant requirement for their stop, search, and seizure of the Defendants. At the suppression hearing held on May 28, 2015 and June 1, 2015, testimony for the People established that the People possessed the requisite reasonable suspicion to conduct a traffic stop. The first stop of Prentice's vehicle did not constitute a Fourth Amendment event, but the second stop did. The People also established that the officers conducted a lawful pat-down and vehicle search for officer safety. The vials of marijuana found in Prentice's top pocket and the vials of marijuana found as a result of the vehicle search will be suppressed because law enforcement exceeded the permissible scope of a warrantless search in seizing them. The marijuana found in the glasses case, the firearm, and the ammunition will not be suppressed because the officers lawfully seized them. Accordingly, for the reasons stated in this Memorandum Opinion, the Court will grant the Defendants' motion to suppress in part and deny it in part. An appropriate Order follows.